IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| ANNA MAY WEALOT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 14-00309-CV-W-DW |
| ) | |
| ALVIN BROOKS, et al., ) | |
| ) | |
| Defendants. ) | |

**ORDER**

Before the Court is the Motion for Summary Judgment (Doc. 30) filed by Defendants Kansas City Board of Police Commissioners, by and through its members, Alvin Brooks, Michael Rader, Angela Wasson-Hunt and Sylvester James (the "Board"), Chief Daryl Forte, and Officers Megan Gates and Kevin Colhour. Plaintiff Anna May Wealot has filed Suggestions in Opposition (Doc. 36) and Defendants have filed Reply Suggestions in Support (Doc. 42).

**I. BACKGROUND**

This case arises from a shooting incident on March 29, 2013, when Megan Gates and Kevin Colhour, police officers employed by the Kansas City, Missouri Police Department, shot and killed Waylen Wealot ("Waylen"). Anna May Wealot, decedent's mother, filed a Complaint containing the following four counts:

I. Wrongful death against Officers Gates and Colhour;

II. Constitutional violations under 42 U.S.C. § 1983 by use of excessive force against Officers Gates and Colhour;

III. Wrongful death against the Board and Chief Forte in his official capacity; and

IV. Constitutional violations under 42 U.S.C. § 1983 by use of excessive force against the Board and Chief Forte in his official capacity.

Based on Defendants' Statement of Uncontroverted Material Facts, Plaintiff's Response, and Defendants' Reply, the following facts are considered undisputed for purposes of the motion, and are also material to its determination. On March 29, 2013 at 5:00 p.m., Officers Gates and Colhour responded to a dispatch call for a disturbance, party armed with a gun at 4014 East 11th Street, Kansas City, Missouri ("the Wealot residence"). Upon arrival, Officers Gates and Colhour spoke with Kelsie Rosewicz and Fred Wealot, who were outside the Wealot residence. Ms. Rosewicz and Fred Wealot told the officers that they had not called the police, that they were having problems with the residents of 1022 Myrtle ("the Lee residence"), who had likely called the police, and that Fred Wealot and Levi Lee had been feuding. During this conversation, Waylen came out of the Wealot residence and yelled "fuck the police" at the officers and told them that he did not want them there. Officers Gates and Colhour then went to the Lee residence to learn the other side of the story. The Lee residence is approximately 300 feet away from the Wealot residence. At the Lee residence, two persons told the officers that members of the Wealot residence had "shot up" their house the previous evening. Officer Gates observed several bullet holes in the side of the Lee residence.

During this conversation, a gold van containing Levi Lee and two or three other persons pulled up to the Lee residence. The van occupants also told the officers that the Wealots had fired shots at the Lee residence the night before. The officers told them to leave the Wealots alone. Levi Lee, Seth Lee, Mary Holmes, and "Juanita" then drove off in the van and stopped at the intersection of 11th and Myrtle. They then exited the van and shouted at Waylen, Fred Wealot and Ms. Rosewicz, who were on the porch of the Wealot residence. Fred Wealot and Ms. Rosewicz walked off the porch into the street. Levi Lee got back in the van and drove it in

2

the direction of Fred Wealot and Ms. Rosewicz. Waylen went into the house, got a gun and came back outside. Waylen then shot at the van multiple times.

While the officers were speaking with a neighbor, they heard a loud bang or gunshot. The officers heard persons at the Lee residence shout "they're shooting" and/or "they got guns." Officer Gates saw Waylen fire two rounds at the van. Officer Colhour saw Waylen fire two or three rounds at the van. The shots fired by Waylen were also fired in the general direction of the officers. Officer Gates drew her weapon and began to chase Waylen. Waylen began running with the gun in his hand. Waylen jumped a fence on the west side of the Wealot residence. When Waylen jumped the fence, he still had the gun in his hand. Fred Wealot was running either on the sidewalk or in the front yard of the Wealot residence, on the southeast side of the Wealot residence. Fred Wealot saw Waylen throw his gun away after he jumped the fence. At the time Fred Wealot saw Waylen threw the gun away, Waylen was on the west side of the Wealot residence and the east side of a tree surrounded by brush. Ms. Rosewicz also saw Waylen throw the gun away before the officers shot him. At that time, she was running north ward across the street towards the southwest side of the Wealot residence. Waylen ran northward along the west side of the Wealot residence. The officers were running eastward, through a vacant lot, toward the west side of the Wealot residence. Officer Gates observed Waylen running with the gun in his hand. Officer Colhour also observed Waylen running with the gun in his hand. Waylen turned towards the officers as they approached. The officers were six to ten feet from him when he turned towards them. As Waylen turned towards them with his hands bent up at his sides, the officers discharged their weapons. Officer Gates fired eight times and Officer Colhour fired twice. Although Officer Gates did not see the gun in Waylen's hands right before she began shooting or while she was shooting, she did not see him drop the gun at

3

any point before she fired. Officer Colhour believed that he observed the gun in Waylen's hand before he fired. Waylen suffered eight gunshot wounds. The gun was found five to seven feet from his body. From the time that Waylen shot at the van until the time that the officers shot him, less than ten seconds elapsed.

## II. STANDARD

Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 850 (8th Cir. 2005). The moving party bears the burden of demonstrating that there are no genuine issues of material fact. Winthrop Res. Corp. v. Eaton Hydraulics, Inc., 361 F.3d 465, 468 (8th Cir. 2004). If the moving party has properly supported its motion for summary judgment, then the burden shifts to the non-moving party to show that a genuine issue of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984).

## III. DISCUSSION

**A. Section 1983 claims against Officers Gates and Colhour**

Officers Gates and Colhour argue that they are entitled to summary judgment in that qualified immunity bars Ms. Wealot's Section 1983 claims for excessive force. Qualified immunity shields government officials from liability for civil damages in performing discretionary tasks unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, in deciding the issue of qualified immunity, a court "must first determine

4

whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." Pace v. City of Des Moines, 201 F.3d 1050, 1055 (8th Cir. 2000) (quoting Conn v. Gabbert, 526 U.S. 286, 290 (1999)).

A claim that a police officer used excessive force is governed by the Fourth Amendment's prohibition against unreasonable seizures. Graham v. Connor, 490 U.S. 386, 395 (1989). A court should consider the reasonableness of the use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396. "(T)he question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. Facts and circumstances to be considered include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. A court should allow for the fact that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97. Furthermore, "deadly force is justified where the totality of the circumstances give the officer probable cause to believe that a fleeing suspect poses a threat of serious physical harm to the officer or others." Thompson v. Hubbard, 257 F.3d 896, 899 (8th Cir. 2001).

Here, it is undisputed that Officers Gates and Colhour shot and killed Waylen. However, in light of the totality of the circumstances facing the officers, the Court concludes that their use of force was objectively reasonable. Specifically, the officers responded to a call for a disturbance, party armed with a gun. On arrival at the Wealot residence, they were told that Fred

Wealot and Levi Lee had been feuding. Waylen told the officers he did not want them there and yelled "fuck the police." The officers went to the nearby Lee residence, where they were told that the Wealots had "shot up" their house the previous evening. Officer Gates saw bullet holes in the Lee residence. Levi Lee drove off in a van, and shortly after the officers heard gunshots. The officers heard the Lees shout "they're shooting" and/or "they got guns." The officers saw Waylen fire a gun two or three times at the van as well as in the general direction of the officers. The officers ran towards the Wealot residence. The officers saw Waylen running with a gun. Neither officer saw Waylen drop the gun. Waylen turned toward the officers with his hands bent at his waist. The officers shot Waylen as he turned towards them. The officers were six to ten feet from Waylen when they fired. Less than ten seconds elapsed from the time Waylen shot at the van to the time the officers shot Waylen. These material events unfolded very quickly, leaving no time for the officers to confirm that Waylen had thrown the gun away. See Thompson, 257 F.3d at 899 ("An officer is not constitutionally required to wait until he sets eyes upon the weapon before employing deadly force to protect himself against a fleeing suspect who turns and moves as though to draw a gun."). Furthermore, the officers had just observed Waylen commit the serious crime of firing the gun at the van and in direction of the officers. Waylen then fled while still holding the gun. Under these circumstances, it was not objectively unreasonable for the officers to believe that Waylen posed a threat of serious harm to them or others, justifying the officers' use of force.

Although Ms. Wealot argues that whether the officers saw Waylen throw the gun is disputed, she has not presented facts that contradict what the officers reasonably viewed from their perspectives. Specifically, while the officers were running after Waylen, their views of him were from different angles and directions than those of Fred Wealot and Ms. Rosewicz. In

6

Wealot and Levi Lee had been feuding. Waylen told the officers he did not want them there and yelled "fuck the police." The officers went to the nearby Lee residence, where they were told that the Wealots had "shot up" their house the previous evening. Officer Gates saw bullet holes in the Lee residence. Levi Lee drove off in a van, and shortly after the officers heard gunshots. The officers heard the Lees shout "they're shooting" and/or "they got guns." The officers saw Waylen fire a gun two or three times at the van as well as in the general direction of the officers. The officers ran towards the Wealot residence. The officers saw Waylen running with a gun. Neither officer saw Waylen drop the gun. Waylen turned toward the officers with his hands bent at his waist. The officers shot Waylen as he turned towards them. The officers were six to ten feet from Waylen when they fired. Less than ten seconds elapsed from the time Waylen shot at the van to the time the officers shot Waylen. These material events unfolded very quickly, leaving no time for the officers to confirm that Waylen had thrown the gun away. See Thompson, 257 F.3d at 899 ("An officer is not constitutionally required to wait until he sets eyes upon the weapon before employing deadly force to protect himself against a fleeing suspect who turns and moves as though to draw a gun."). Furthermore, the officers had just observed Waylen commit the serious crime of firing the gun at the van and in direction of the officers. Waylen then fled while still holding the gun. Under these circumstances, it was not objectively unreasonable for the officers to believe that Waylen posed a threat of serious harm to them or others, justifying the officers' use of force.

Although Ms. Wealot argues that whether the officers saw Waylen throw the gun is disputed, she has not presented facts that contradict what the officers reasonably viewed from their perspectives. Specifically, while the officers were running after Waylen, their views of him were from different angles and directions than those of Fred Wealot and Ms. Rosewicz. In

addition, according to Fred Wealot, when Waylen threw the gun away, the officers' views of him would have been obscured by a tree and brush. See Loch v. City of Litchfield, 689 F.3d 961, 966 (8th Cir. 2012) ("[a]n act taken on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment. Even if a suspect is ultimately found to be unarmed, a police officer can still employ deadly force if objectively reasonable").

Ms. Wealot also argues that the officers acted unreasonably by shooting Waylen after he had fallen to the ground and was no longer a threat, as the gun was ultimately found five to seven feet away from his body. She states that the officers "shot and killed Waylen as he was surrendering to police. Waylen was turning around with his hands up prior to the officers shooting and killing him." The facts, however, show that in the very brief ten seconds at issue, neither officer observed Waylen drop his gun, nor were Waylen's hands up in the air. Ms. Rosewicz stated specifically that Waylen had partially turned towards the officers with his hands bent up at his sides when the officer shot him. Under such "tense, uncertain, and rapidly evolving" circumstances, it is not objectively unreasonable that the officers interpreted Waylen's actions as resistance, believing that he was turning to fire at them. See Billingsley v. City of Omaha, 277 F.3d 990, 993 (8th Cir. 2002) ("reasonableness of force is judged from the perspective of the officer on the scene, taking into consideration the facts known to him, as opposed to one possessing the illuminating power of hindsight"); see also Loch, 689 F.3d at 963 (holding it was objectively reasonable for officer to shoot suspect eight times, where officer believed suspect was reaching for a gun at his side).

Lastly, Ms. Wealot argues that it is disputed as to whether the officers yelled "drop the gun" at Waylen prior to shooting. "[W]here it is feasible, a police officer should give a warning that deadly force is going to be used." Estate of Morgan v. Cook, 686 F.3d 494, 497 (8th Cir.

7

2012) (citing Tenn. v. Garner, 471 U.S. 1, 11-12 (1985)).  However, in a span of less than ten seconds, the officers chased Waylen with their firearms drawn, and Waylen turned towards them with his hands bent at his waist.  Under these circumstances, Waylen was "on notice that his escalation of the situation would result in the use of the firearm." Loch, 689 F.3d at 967.

Based on the foregoing, the Court concludes that no rational jury could conclude that Officer Gates' and Officer Colhour's use of force was objectively unreasonable under the rapidly-evolving circumstances with which they were presented.  Therefore, the officers did not violate Waylen's Fourth Amendment rights and are entitled to qualified immunity.  Thus, the Court will grant summary judgment in favor of the officers on the Section 1983 claim.

**B. Section 1983 claims against the Board and Chief Forte**

Ms. Wealot's Section 1983 claims against the Board and Chief Forte are based on alleged policies, customs, and/or actions which lead to the officers' acts, resulting in Waylen's death. "This circuit has consistently recognized a general rule that in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim." Moore v. City of Desloge, 647 F.3d 841, 849 (8th Cir. 2011).  Here, because Ms. Wealot has failed to establish that the officers violated Waylen's constitutional rights, Ms. Wealot cannot maintain her federal claims against the Board or Chief Forte.

**C. Wrongful death claims against Officers Gates, Officer Colhour, and Chief Forte**

Officers Gates, Officer Colhour and Chief Forte argue that they are entitled to summary judgment in that official immunity bars Ms. Wealot's state law wrongful death claims.  The doctrine of official immunity "provides that public officials acting within the scope of their authority are not liable in tort for injuries arising from their discretionary acts or omissions." Seiner v. Drenon, 304 F.3d 810, 813 (8th Cir. 2002) (quoting DaVee v. Mathis, 812 S.W.2d 816,

8

827 (Mo. App. 1991)).  The official immunity doctrine applies to wrongful death actions. Id. (citing Miller v Smith, 921 S.W.2d 39, 46 (Mo. App. 1996)).  Furthermore, "a police officer's decision to use force in the performance of his duties is discretionary rather than ministerial." Davis v. White, 794 F.3d 1008, 1013 (8th Cir. 2015).  Accordingly, the Court concludes that Officers Gates and Colhour are protected by official immunity from liability for the shooting.

Likewise, the doctrine of official immunity is also intended to shield highly discretionary supervisory and policy decisions. Southers v. City of Farmington, 263 S.W.3d 603, 621 (Mo. 2008).  As a result, the claims against Chief Forte regarding alleged policies, customs, and/or actions are also barred by official immunity.

Ms. Wealot argues that official immunity "does not apply to discretionary acts done in bad faith or with malice." Davis, 794 F.3d at 1013.  However, based on the factual analysis set forth above as to the federal claims, the Court finds no evidence that the officers or Chief Forte acted in bad faith or with malice.  Thus, summary judgment will be granted as to the wrongful death claims against Officers Gates and Colhour and Chief Forte.

### D. Wrongful death claims against the Board

As for the state law wrongful death claim asserted against the Board in Count III, Ms. Wealot concedes that Count III should be dismissed as to the Board.  Accordingly, the Court will grant summary judgment on the wrongful death claim against the Board and its members.

Based on the foregoing, it is ORDERED that Defendants' Motion for Summary Judgment (Doc. 30) is GRANTED in favor of all Defendants as to all of Plaintiff's claims.

SO ORDERED.

Date:  December 21, 2015             /s/ Dean Whipple
                                     Dean Whipple
                                     United States District Judge